Filed 1/12/16  P. v. Gray CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MARCELLE DEVON GRAY et al.,<br><br>  Defendants and Appellants. | F068698<br><br>(Fresno Super. Ct. No. F12908580)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  James M. Petrucelli, Judge.

Matthew H. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant Marcelle Devon Gray.

John J. Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant Robert Lee Kelso.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendants Marcelle Devon Gray and Robert Lee Kelso were convicted of several crimes – including active participation in a criminal street gang – arising out of a shooting incident at a Denny's restaurant.

Gray contends on appeal the gang allegations against them were not supported by substantial evidence and that the opinion of the prosecution's gang expert was inadmissible because it lacked foundation.[1] We reject the first contention and find the second was forfeited by a failure to object below. (See Evid. Code, § 353.)

Kelso argues the court improperly admitted testimony concerning the contents of police reports describing his prior contacts with law enforcement.[2] Because the officer who testified about the information from the police reports did not author them, nor did he personally observe the events described therein, we conclude the evidence was improper under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), and its progeny. (See *Bullcoming v. New Mexico* (2011) 131 S.Ct. 2705, 2714–2715 (*Bullcoming*).)

Kelso also contends that, under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), the court improperly admitted evidence concerning his answers to jail classification questions asking if he associated with any street or prison gangs. After briefing was completed in this case, the California Supreme Court largely resolved this issue in defendants' favor in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*). We, therefore, accept Kelso's argument on this point.

Finally, we cannot conclude the *Crawford* and *Miranda* errors were harmless beyond a reasonable doubt and therefore reverse the conviction on count 5 and the gang enhancements to counts 1 and 2.

We affirm the convictions on counts 1 through 4 and all other enhancements.

---

[1] Kelso joined Gray's arguments.

[2] Gray joined in Kelso's arguments.

## STATEMENT OF THE CASE

A second amended information charged defendants with committing the following crimes on September 11, 2011: assaulting Anthony Welch (Welch) with a firearm (count 1 – Pen. Code, § 245, subd. (a)(2)[3]); assaulting Mark Panopio (Panopio) with a firearm (count 2 - § 245, subd. (a)(2)); possessing a firearm as a felon (counts 3 and 4[4] - § 12021, subd. (a)(1)); and street terrorism (count 5 - § 186.22, subd. (a)). The information also alleged that in the commission of the assaults, Gray personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) on Welch and Panopio. The information further alleged that both assaults were committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) Finally, the information alleged that Kelso had suffered a prior serious felony conviction. (§§ 667, subds. (a)(1) & (b)–(i), 1170.12, subds. (a)–(d).)

A jury convicted defendants on all counts and found all of the special allegations true. Separately, Kelso admitted the prior serious felony conviction.

The court sentenced Gray to an aggregate term of 31 years eight months, comprised of the following: a base term of four years on count 1, plus 10 years for the firearm enhancement (§ 12022.5, subd. (a)), plus 10 years for the gang enhancement (§ 186.22, subd. (b)(1)); a consecutive term of seven years eight months on count 2 and the attached firearm and gang enhancements; a concurrent term of three years on count 3; and a stayed term (§ 654) of three years on count 5.[5]

The court sentenced Kelso to an aggregate term of 21 years eight months, comprised of the following: four years on count 1, doubled to eight years for the prior serious felony conviction (§§ 667, subd. (e)(1); 1170.12, subd. (c)(1)), plus five years for

---

[3] All future statutory references are to the Penal Code unless otherwise noted.

[4] Count 3 applied to defendant Gray and count 4 applied to defendant Kelso.

[5] The court stayed the great bodily injury enhancements. (§ 12022.7, subd. (a).)

3.

the prior conviction (§ 667, subd. (a)), plus five years for the gang enhancement (§ 186.22, subd. (b)(1)); a consecutive term of two years on count 2, plus one year eight months on the gang enhancement (§ 186.22, subd. (b)(1)); a concurrent term of three years on count 4; and a stayed term (§ 654) of three years on count 5.

# FACTS

*Welch's Testimony*

Anthony Welch was with his friends Carlos, George and Andrew at a Denny's restaurant at around 3:20 a.m. As Welch got up from his booth, he bumped shoulders with defendant Kelso, whom he had never seen before. The two did not exchange any words at the time.

Welch and his group paid their tab and went outside. Once Welch was outside with George and Andrew,[6] Kelso told Welch he had bumped him without saying anything. Welch said, "[M]y bad, or whatever." Welch saw Kelso was with another man later identified as Dante Hatcher (Hatcher). Hatcher asked if "everything was cool." Welch said, "[W]e're good" and said he was not trying to fight or anything like that. Welch and Hatcher did a "fist bump" – a gesture intended to communicate: "[H]ey, we're all cool."

Kelso, however, was still upset about the earlier bump with Welch. Kelso said Welch did not know he had a gun, lifted up his shirt and exposed a firearm tucked into his waistband. Kelso eventually put his shirt down and Andrew "said something to him referencing that – because he's a smaller framed guy … you think you tough, huh, or something like that." Andrew then went back into Denny's.

After a few moments, defendant Gray came over. Kelso said that Welch had bumped him and "thought he was going to get away with it, or keep on walking or whatever." Gray asked Kelso who had bumped him and Kelso pointed out Welch.

---

[6] It is unclear where Carlos was at this point.

Welch reiterated, "We're not here for this. I got other plans tonight." Welch began to walk back in to the Denny's. He looked back at defendants and saw Kelso nod his head. He did not see Kelso reach for the weapon in his waistband. Welch then heard a gunshot. Welch felt a sting and immediately hit the ground. Additional shots were fired, and Welch felt a sharp pain in his buttocks. Welch then jumped up and moved towards Gray. Welch saw Gray holding a gun that was "pointed up, shooting." Welch did not know what type of gun Gray was holding. Gray fired another shot that hit Welch in the stomach, causing him to fall again. Gray, Kelso and another individual then ran to a car.

*Panopio's Testimony*

At around 3:00 a.m., Panopio was standing in front of the Denny's entrance while one of his friends was paying the bill. Panopio heard a pop and thought it was a firecracker. He looked to his left and saw a man holding what looked like a gun. Panopio tried to get on the ground but was shot on his left hip. He felt an intense pain and went to the ground because he could not run. Panopio identified Gray as the shooter in court. Panopio also testified that Kelso had been standing next to Gray when the shooting started.

*Law Enforcement's Pursuit and Arrest of Defendants*

Fresno Police Officer Jay Van Meeter was driving his patrol vehicle at approximately 3:25 a.m. when he heard "several rapid succession gunshots." The only nearby business Officer Van Meeter knew to be open at that time of morning was the Denny's on Shaw Avenue. Van Meeter notified his dispatcher of the situation and began to drive towards the Denny's. He approached the Denny's traveling the wrong direction in the westbound lanes with his lights off. He then observed a vehicle with no lights on exit the Denny's driveway onto Shaw Avenue. The car drove past Van Meeter's vehicle on Shaw Avenue. Van Meeter observed "at least" two occupants. Van Meeter made a U-turn and eventually activated his emergency lights. He then chased the vehicle, which made several turns. Van Meeter saw what appeared to be a white bag thrown from the

5.

vehicle. The vehicle eventually stopped with defendants inside, along with Hatcher and a man named David Ruiz. Hatcher was identified as the driver.

Officer Van Meeter asked Officer Daniel Fink to attempt to locate whatever had been thrown from the car during the pursuit. Officer Fink located a silver semiautomatic handgun inside a "bunched up" T-shirt on the side of the road.

Later that morning, Officer Romero showed Kelso a still photograph from Denny's indoor surveillance footage. The photograph depicted three individuals standing near the front register of the Denny's and was timestamped around 3:20 or 3:25 a.m. Kelso identified himself in the photograph as the man wearing a black hat and a white shirt. Romero asked Kelso where his white shirt went and Kelso said he took it off and it should be inside the vehicle. However, no white shirt was found inside the vehicle.

At the hospital, Welch told a detective that Kelso had looked at Gray and said, "That's the boy that bumped into me but he doesn't know I have the hammer." Welch told the detective he had been shot by both Gray and Kelso.

Several bullet fragments were recovered from a wall at the Denny's. A criminalist testified that one of the recovered fragments could not have been fired by the firearm recovered by Officer Fink in the "bunched up" T-shirt. Two other bullet fragments recovered at the scene were too small to test.

*Gunshot Residue Testing*

*Gray*

A criminalist tested samples from defendant Gray's hands for gunshot residue. No gunshot residue was detected on the sample from Gray's right hand. On the sample from Gray's left hand, the criminalist found one barium and one lead particle. However, the criminalist testified that in order to classify a sample as "characteristic" of gunshot residue, there would need to be particles of barium, lead *and* antimony. When only two of the three are found, it "could be" indicative of gunshot residue. However, it is also possible the particles were simply have been present in the environment.

6.

*Kelso*

The criminalist also tested samples from defendant Kelso's hands. The sample from Kelso's right hand contained one particle that was characteristic of gunshot residue, containing barium, lead and antimony. This led the criminalist to conclude that Kelso "probably was around a firearm or surface that had gunshot residue." However, because only one "characteristic" gunshot residue particle was detected, the criminalist acknowledged that "there is a potential for him picking up the one particle, say, in a police car, or maybe even a person that sat by him." The criminalist would need to see "more than three particles to say for sure that he definitely, absolutely was around [a gun]."

No gunshot residue was found on the sample from Kelso's left hand.

**Gang Evidence**

September 11, 2011, Jail Classification Interviews

*Gray*

During a jail classification interview on September 11, 2011, a correctional officer asked Gray whether he associated with any street or prison gangs. Gray said he was a "Villa Posse associate." The correctional officer noted that Gray had a tattoo reading "Olive Boy" on his forearm.

*Kelso*

A correctional officer asked Kelso whether he associated with any gangs or "crews." Kelso said he was a "Villa Posse associate."

Testimony of Gang Expert Ron Flowers

Fresno Police Officer Ron Flowers testified as the prosecution's gang expert.[7] Officer Flowers testified that other detectives told him that "Peach and Olive"[8] is a gang

---

[7] The trial court designated Fresno Police Officer Ron Flowers an expert in African American gangs.

7.

that "morphed from another gang called the Villa Posse, which is based in southwest Fresno." The Peach and Olive gang is also known as the "5300 Block." "Oftentimes, Peach and Olive or 5300 Block is referred to as an east side version of the Villa Posse, a lot of family connections and [] roots out of [the] southwest."

Over his career, Officer Flowers has had contact with six to 10 members of the Peach and Olive gang, which has approximately 40 to 50 total members. Flowers learned this information by speaking to rival gang members and from "other information" to which he has access.

Officer Flowers "was told and often saw" Peach and Olive gang members associating with the color orange. Officer Flowers also testified that "black is pretty common, as well as red." Officer Flowers further noted that he had "seen blue."[9]

Officer Flowers identified the following symbols or signs associated with the gang: "5300 block," the intersection of Peach and Olive, "east side," "mob," and "East Side Mafia." When asked if the Peach and Olive gang identified with any particular letters of the alphabet, Flowers responded: "Personally I've seen E for what I believe is East or East Side and also the letter S for side."

Officer Flowers testified that there are two major gang alliances in Fresno: Twamp and M.U.G.[10] The two alliances are rivals of one another. The Villa Posse and Peach and Olive gangs fall under the Twamp alliance.

---

[8] Members refer to the gang as simply, "Peach and Olive." Law enforcement refers to the gang as the "Peach and Olive criminal street gang." For simplicity, we refer to the gang as the "Peach and Olive gang."

[9] Officer Flowers simply testified, "I've seen blue." The context suggests this testimony indicates that Flowers had seen Peach and Olive gang members wearing the color blue.

[10] Twamp is a slang term for the number 20 and can be spelled "Twomp," "Twamp" or "Twump." M.U.G. is an acronym identifying the three original gangs that formed the alliance: the Modoc Boys, the U Boys and Garrett Street or Garrett Street Posse.

8.

Officer Flowers learned about the criminal activities of the Peach and Olive gang from his investigations and conversations he had with Peach and Olive gang members and rival gang members. Those activities include the sale of narcotics, illegal firearm possession, shootings, and assault.

Officer Flowers also testified concerning predicate offenses committed by Berton Newton,[11] Tommie Hellon, Brook Woods, James Gearon, Christopher Cookson and Adeyemi Russell.

*Gray*

Jail Classifications

Officer Flowers reviewed a jail classification document from October 2, 2008.[12] The document indicated that Gray admitted to membership in the Villa Posse gang.

Officer Flowers also reviewed a jail classification form dated February 3, 2010. That document indicated that Gray "mentioned that he was affiliated or associated with the Villa Posse, but also Peach and Olive."

Finally, Officer Flowers reviewed a classification form from September 11, 2011. That document indicated that Gray said he was associated with the Villa Posse and that he expected to have problems with inmates aligned with M.U.G.

Tattoos

Officer Flowers also described several of Gray's tattoos. Gray had tattoos that read "Peach and Olive" and "E" and "S." Officer Flowers testified that the "E" and "S" tattoos stood for "east side." Officer Flowers concluded these tattoos, along with other evidence, showed that Gray was a member of the Peach and Olive gang.

---

[11] Officer Flowers was familiar with Berton Newton from "various investigations" and information from other police officers.

[12] Officer Flowers never interviewed or contacted Gray.

Prior Contacts with Law Enforcement

Officer Flowers reviewed several reports which indicated the following: on March 17, 2008, Gray had been wearing black clothing in Peach and Olive gang territory with a member of the Villa Posse named Cameron Ireland; on October 2, 2008, Gray was wearing black in Peach and Olive gang territory; on February 3, 2010, Gray was wearing black; on July 24, 2010, Gray was wearing black in Peach and Olive gang territory; on February 11, 2011, Gray was wearing black in Peach and Olive gang territory with a member of the Peach and Olive gang named Tyshon Smith; on March 22, 2011, Gray was wearing black and red in Peach and Olive gang territory; and on June 4, 2011, Gray was with Cory Thomas, who affiliates with "Grove Street" which is under the Twamp alliance, and David Ruiz who is a member of the Peach and Olive gang.

Current Offense

Officer Flowers also testified that during the Denny's incident underlying the charges in the present case, Gray was wearing black and was with other Peach and Olive gang members. Flowers determined that Dane Hatcher is a member of the Peach and Olive gang.

Conclusion Regarding Gang Membership

Officer Flowers concluded that in 2011, Gray was a member of the Peach and Olive gang.

*Kelso*

Jail Classifications

Officer Flowers reviewed several jail classification forms which indicated the following: In July 2005, Kelso admitted he was a member of the Villa Posse by virtue of his family[13]; in April 2006 Kelso admitted he was a member of the Villa Posse by virtue

---

**13** Officer Flowers did not recall the exact wording on the form but did remember that the form had some notation regarding Kelso's family.

of his family; on June 26, 2006, Kelso admitted to being a member of Villa Posse and being associated with the Twamp alliance; on July 10, 2006, Kelso denied membership in a criminal street gang but indicated he would have "potential problems" with gangs aligned with the M.U.G. alliance; on December 11, 2006, Kelso admitted membership in Villa Posse and said he would have problems with persons affiliated with M.U.G.

Tattoos

Officer Flowers testified that Kelso had the letters "P" and "O" tattooed on his body and that they stood for "Peach and Olive."

Prior Contacts with Law Enforcement

Officer Flowers reviewed several reports, which indicated the following: On July 11, 2005, Kelso was arrested with a member of Villa Posse named Germane Leavey; on June 26, 2006, Kelso was wearing blue clothing; on January 26, 2007, Kelso was wearing a red-colored beanie cap and a black jacket; on March 7, 2007, Kelso was wearing black and was with a member of the East Side Bulldogs gang named Anthony Castaneda; on November 28, 2007, Kelso was arrested with a member of Villa Posse named Damon Thomas; on December 9, 2007, Kelso was again found associated with Thomas; on November 4, 2009, Kelso was wearing blue and white clothing; on January 7, 2011, Kelso was wearing a red-colored cap or hat and a black shirt; and on June 12, 2011, Kelso was found associating with Peach and Olive gang member Hatcher and Villa Posse gang member Adeyemi Russell.

Conclusion Regarding Gang Membership

Officer Flowers stated his opinion that Kelso is a member of the Peach and Olive gang.

**DISCUSSION**

I.      Substantial Evidence Supported the Gang Enhancements

Defendants argue that the gang enhancements should be reversed because there

11.

was insufficient evidence the assault was committed with the specific intent to promote, further, or benefit the gang.

*A. Law*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)

In order for the gang enhancement to apply, a defendant must have committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members…." (§ 186.22, subd. (b)(1).)

*B. Evidence*

Officer Flowers testified that a person must have "respect" in order to survive in a gang. Gang members strive for respect from other members of their own gang, rival gangs and the public at large. There are two primary ways Fresno-area gang members earn respect: violence and acquiring money. Gang members "want people to be afraid of them" and engage in violence for that reason. Gang members want to punish those who disrespect the gang.

When a gang member is disrespected, they retaliate quickly and "unkindly." If a gang member does not respond to an act of disrespect, their reputation within the gang

12.

can be diminished.  Gangs seek the notoriety generated when its members commit acts of violence.

The prosecutor posed a hypothetical to Officer Flowers mirroring the facts of this case.  Flowers testified that such a crime would be committed in association with and for the benefit of the gang.[14]

*C.  Gang-relatedness*

Officer Flowers's testimony was sufficient to support the gang-relatedness prong.

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang' within the meaning of section 186.22(b)(1).)  [Citations.]  (*Albillar*, *supra*, 51 Cal.4th at p. 63.)  As described above, Officer Flowers provided such an opinion to the jury.  Under *Albillar*, the expert opinion raised an inference of gang-relatedness – an inference we must accept on substantial evidence review because it supports the judgment.

---

**14** Officer Flowers's opinions were based, in part, on the evidence that defendants and Hatcher were gang members.  Below we conclude that much of that evidence was improperly admitted and therefore reverse the gang convictions and enhancements.  However, we are not reversing on the basis of insufficient evidence, which would prevent retrial on remand.  "[W]here reversal of a conviction is premised on trial court error in admitting evidence against the defendant, retrial is not prohibited notwithstanding that the quantum of admissible evidence at trial may have been legally insufficient to sustain a conviction…."  (*People v. Harvey* (1984) 163 Cal.App.3d 90, 108; see *Lockhart v. Nelson* (1988) 488 U.S. 33, 40.)

Of course, if *all* the evidence adduced at trial – including erroneously-admitted evidence – was insufficient to support a conviction, then retrial would be barred.  In this section, we analyze whether the admissible and inadmissible evidence was sufficient to sustain the gang enhancement.

*D. Intent*

The second aspect of the gang enhancement requires that the underlying felony be committed with the "specific intent to promote, further, or assist in any criminal conduct by gang members…." (§ 186.22, subd. (b)(1).)

"[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members."[15] (*Albillar*, *supra*, 51 Cal.4th at p. 68.) Here, substantial evidence showed Gray and Kelso intended to assault Welch with known members of a gang (i.e., each other and Hatcher). That evidence is sufficient to support the gang enhancement's intent requirement on substantial evidence review. (See *ibid*.)

Gray argues that "there was other evidence suggesting that the shots were not fired to preserve the gangs respect, but rather because one of Welch's friends had insulted Kelso. But, based on Officer Flowers's opinion, we concluded above that "the circumstances reasonably justify the trier of fact's findings …." (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Therefore, "reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*Ibid.*)

II.     Gray Failed to Specifically Object to Officer Flowers's Testimony on the Basis That His Opinion Lacked Foundation

Gray argues that Officer Flowers's opinion concerning the gang charges was "unfounded." Specifically, he contends that Flowers's opinion that "the shootings were meant to somehow instill fear and respect for the gang amounted to nothing more than

---

**15** Gray argues that "while the jury 'may' be able to make that inference, it does not follow that it necessarily *will*." (Italics added.) Here, of course, the jury did make that inference as evidenced by the true finding.

14.

speculation." We conclude that Gray failed to raise that objection below and thereby forfeited it. (See Evid. Code, § 353.)

Gray identifies an "objection" presented in his motion *in limine* that he claims is sufficient to preserve the issue on appeal. He cites the following language from the motion: "[O]n direct examination, the expert is not permitted to relate the information being relied upon unless it is otherwise admissible in its own right. To allow the expert to provide the jury with inadmissible testimonial evidence, under the guise that it simply supports his opinion, does not comport with the protections afforded the defendant under the Fifth, Sixth, and Fourteenth Amendments." (Italics removed.)

This language does not preserve the issue Gray now seeks to raise on appeal. The motion *in limine* challenged the admission of testimonial evidence underlying Officer Flowers's opinion; it did not challenge the admission of the opinion itself. This conclusion is bolstered by the very next sentence from the *in limine* motion, which reads: "As such, *despite the admissibility of the gang expert's opinions*, any effort by the prosecution to introduce other testimonial hearsay evidence must be precluded.[]" (Italics added.)[16]

III.    Officer Flowers's Testimony Conveying Incidents He Did Not Personally Observe, Described in Police Reports He Did Not Author, Violated *Crawford*

As described above, Officer Flowers testified about several prior "contacts" Kelso had with law enforcement. These "contacts" revealed that Kelso wore gang colors and was with other gang members on several occasions in the years preceding the Denny's shooting.[17] Flowers's testimony was based on police reports detailing these various "contacts" which occurred from 2005 to 2011.

---

[16] Neither defendant argues that a sufficient objection appears elsewhere in the record.

[17] Officer Flowers provided similar testimony concerning Gray.

15.

Defendants contend that Officer Flowers's testimony improperly conveyed testimonial hearsay in violation of *Crawford*.[18] We agree.

### A. *Confrontation Clause*

The Confrontation Clause affords criminal defendants the right "to be confronted with the witnesses against" them. (U.S. Const., 6th Amend.) The Clause's term "witnesses" means "those who 'bear testimony.' [Citation.]" (*Crawford*, *supra*, 541 U.S. at p. 51.) Consequently, whether a person is a "witness" under the Confrontation Clause turns on whether they "bore testimony" – i.e., whether their statements are "testimonial."

If a statement is testimonial hearsay, it is inadmissible unless "the declarant is unavailable, and … the defendant has had a prior opportunity to cross-examine." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. omitted.)

### B. *Police Reports are Testimonial*

The Attorney General argues police reports are not testimonial.[19] We disagree.

Testimonial out-of-court statements have two critical components. (*People v. Dungo* (2012) 55 Cal.4th 608, 619.) "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution…." (*Ibid*.)

For example, " 'material[s] such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, *or similar pretrial statements that declarants would reasonably expect to be used prosecutorially*' " are all testimonial.

---

[18] The Attorney General concedes defendants made a Confrontation Clause objection below.

[19] The Attorney General also argues that information conveyed between officers concerning "general knowledge about local gangs" is not testimonial. We would probably agree, but need not decide the issue. Defendants' Confrontation Clause argument focuses on the police reports, not the "general gang culture information" shared between colleagues. (Appellant Kelso's reply brief at p. 10 ["This is not about one officer sharing general gang culture information with a colleague."].)

16.

(*Crawford*, *supra*, 541 U.S. at p. 51, italics added.) Similarly, documents created solely for an evidentiary purpose in aid of a police investigation are testimonial. (*Bullcoming*, *supra*, 131 S.Ct. at p. 2717, citing *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310–311.)

Police reports satisfy these definitions of testimonial statements. (See *People v. Edwards* (2015) 241 Cal.App.4th 213, 262 (*Edwards*); see also *Bullcoming*, *supra*, 131 S.Ct. at pp. 2714–2715.) In *Edwards*, *supra*, the court held "that police reports summarizing the historical facts of an offense are typically testimonial in nature. [Citations.]" (*Edwards* at p. 262.) The court reasoned: "The usual purpose of a police report is to assist in the prosecution of a crime, and a police report is written with a high degree of formality and solemnity. 'A police report is a quintessential example of an extrajudicial statement contained in a formalized testimonial material. It is signed by the attesting officer under penalty of law. It is prepared 'with an eye toward prosecution'; [citation]; and it is inherently accusatory.' [Citation.]"[20] (*Ibid.*)

We agree. Police reports are pretrial written statements made by a declarant (i.e., the authoring officer) who would reasonably expect them to be used prosecutorially. (See *Crawford*, *supra*, 541 U.S. at p. 51 [one category of testimonial statement is any pretrial statement similar to an affidavit, custodial examination, or prior testimony that is made by a declarant who would reasonably expect the statement to be used prosecutorially].)

The Attorney General seeks to avoid this straightforward conclusion by analogizing police reports to rap sheets and records of conviction.[21] We find these arguments unpersuasive.

---

[20] In *Edwards*, however, the declarant-officer testified and was thereby made available for cross-examination. (*Edwards*, *supra*, 241 Cal.App.4th at p. 262.)

[21] The Attorney General also notes that a "question has arisen" concerning whether matters relied on by an expert are elicited for their truth. (Compare *People v.*

17.

First, the Attorney General cites *People v. Morris* (2008) 166 Cal.App.4th 363, 372–373 and describes the case as holding that "business records and official records such as rap sheets are not testimonial under *Crawford*." It is true that there is a longstanding hearsay exception for business records, which are not testimonial under *Crawford*.[22] (*Crawford*, *supra*, 541 U.S. at p. 56.) But police reports and rap sheets are different in the only way that matters here. "The past facts being communicated in a rap sheet are not facts relating to the charged criminal activity…." (*People v. Morris*, *supra*, 166 Cal.App.4th at p. 372.) Conversely, "[t]he usual purpose of a police report is to assist in the prosecution of a crime …. 'It is "prepared with an eye toward prosecution"; [citation] and it is inherently accusatory.' [Citation.]" (*Edwards*, *supra*, 241 Cal.App.4th at p. 262.) Police reports, unlike rap sheets, are testimonial. (*Ibid*.)

The Attorney General also cites *People v. Taulton* (2005) 129 Cal.App.4th 1218 for the proposition that "records of prior convictions and incarceration are not testimonial." But *Taulton* held those records were nontestimonial because "they are not prepared for the purpose of providing evidence in criminal trials *or for determining whether criminal charges should issue*…." (*Id*. at p. 1225, italics added.) In contrast, police reports *are* "prepared 'with an eye towards prosecution' " and are therefore testimonial. (*People v. Edwards*, *supra*, 241 Cal.App.4th at p. 262.)

*C. Conclusion*

A hypothetical posed by the U.S. Supreme Court is instructive:

*Thomas* (2005) 130 Cal.App.4th 1202, 1210 with *People v. Valadez* (2013) 220 Cal.App.4th 16, 32.) The Attorney General presents no argument on the issue, however, and does not contend that *Thomas*'s holding is valid and applicable here.

[22] Moreover, police reports do not fall under the business records exception. (*People v. Ayers* (2005) 125 Cal.App.4th 988, 994; see also *Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at pp. 321–322 ["analysts' certificates – *like police reports generated by law enforcement officials* – do not qualify as business or public records…"].)

"Suppose a police report recorded an objective fact [such as] the address above the front door of a house …. Could an officer other than the one who saw the number on the house … present the information in court …? As our precedent makes plain, the answer is emphatically 'No.' [Citations.]" (*Bullcoming*, *supra*, 131 S.Ct. at pp. 2714–2715.)

Officer Flowers, without personal first-hand knowledge, conveyed objective facts described in police reports he did not author. Because the police reports were testimonial out-of-court statements, the admission of Flowers's testimony conveying their contents violated the Sixth Amendment.

IV.     Jail Classification Questions Asking Defendants if They Associated With Any Street or Prison Gang Were Subject to the Requirements of *Miranda*

In the trial court, defendants objected to admission of evidence concerning their admissions of gang membership during their respective jail classification interviews. The court held an Evidence Code section 402 hearing on the issue, where the following testimony was elicited.

*Correctional Officer John Palacios*

Correctional Officer John Palacios is assigned to jail classification at the Fresno County Jail. Palacios testified that all inmates at the jail go through the same intake system.

When an inmate is first brought to the jail, they are interviewed. Before the interview, Officer Palacios checks the inmate's custodial history, where he has been housed, whether he has been involved in assaults with other inmates and whether he has been in prison before. Sometimes, correctional officers review the police report for the underlying incident before the interview.

Correctional officers ask inmates certain questions to determine where they will be housed. Inmates are asked "if they have any prison time, gang association or affiliation, if they're homosexual, if they've ever been sexually assaulted before, would they feel [] they're going to have any problems with any individuals, if they ever testified in court

19.

against anyone." Usually, Officer Palacios will ask if the inmate has any gang tattoos. The inmates are not given *Miranda* warnings before the interview.

The reason inmates are asked about gang affiliation is "safety, because if he's from a gang, [correctional officers] don't want to house them with rival gang members." Officer Palacios recounted that fights have occurred at the jail as the result of an improper classification. He further opined that an inmate could possibly be assaulted or killed if they do not disclose their gang affiliations.

During the interview, Officer Palacios fills out a jail classification form with the answers provided by the inmate. All inmates are asked all of the questions on the form, regardless of whether they are suspected of involvement in a gang crime. The fact that an inmate was arrested on "gang charges" does not affect the questions asked during the jail classification interview.

A newer version of the jail classification form has a place for the inmate to sign. The completed forms are entered into the jail's electronic classification systems.

*Correctional Officer Phillip Hurt*

Correctional Officer Phillip Hurt testified that he recalled conducting a jail classification interview with defendant Kelso, but he did not independently recall the date. Hurt was shown a classification form which indicated the interview he had done with Kelso occurred on October 11, 2011. Hurt testified that that he asked Kelso whether he associated with any street or prison gangs. Kelso responded that he was a Villa Posse associate.

*Correctional Officer Eulalio Gomez*

On September 11, 2011, Correctional Officer Eulalio Gomez asked defendant Gray whether he associated with any street or prison gangs. Gray said he was a Villa Posse associate. Gray signed the jail classification form produced during this interview.

20.

*Trial Court's Ruling*

The trial court concluded defendants' answers during the jail classification interviews fell under the routine booking question exception to *Miranda*.

*A. Analysis*

    1. <u>*Miranda v. Arizona*</u>

Under *Miranda*, *supra*, 384 U.S. 436, "the prosecution may not use statements … stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination…." (*Miranda*, *supra*, 384 U.S. at p. 444.) Usually, the "procedural safeguards" must take the form of admonitions concerning the defendant's rights to silence and counsel.[23] (*Ibid.*)

*Miranda* only applies to statements stemming from a "custodial interrogation." (*Miranda*, *supra*, 384 U.S. at p. 444.) A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way…." (*Ibid.*, fn. removed.)

    a. Applying *Miranda*

A jail classification interview is undoubtedly a custodial interrogation. It is "questioning initiated by law enforcement officers after a person has been taken into custody …." (*Miranda*, *supra*, 384 U.S. at p. 444.) Correctional officers should know that asking an arrestee if they associate with any street or prison gang is reasonably likely to elicit an incriminating response. (See *Elizalde*, *supra*, 61 Cal.4th at pp. 527, 538.) Consequently, unless a *Miranda* exception applies, a defendant's un-*Mirandized*

---

[23] The People did not contend in the trial court, nor do they on appeal, that the *Miranda* rights read to defendants near the time of their arrest covered the subsequent jail classification interview. (See *U.S. v. Barone* (1st. Cir. 1992) 968 F.2d 1378, 1384 [it is the government's burden of showing it complied with procedures required by *Miranda* and its progeny]; see also *Tague v. Louisiana* (1980) 444 U.S. 469, 470–471.)

statements stemming from questions posed during a jailhouse classification interview may not be used by the prosecution.

### b. Routine Booking Question Exception

There are several exceptions to *Miranda*'s warnings requirement. (*Dickerson v. United States* (2000) 530 U.S. 428, 437–438.) One such exception is called the "routine booking question exception." (*Pennsylvania v. Muniz* (1990) 496 U.S. 582 (plur. opn.).) The routing booking question exception "exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' " (*Id.* at p. 601 (plur. opn.).)

The trial court relied on this exception in ruling that the jail classification interview answers concerning gang membership were admissible. However, after briefing was completed in this case, the California Supreme Court unanimously held that questions about gang affiliation during a jail classification exceed the scope of the booking exception, which was meant to apply only to "basic identifying biographical data necessary for booking or pretrial services…."[24] (*Elizalde*, *supra*, 61 Cal.4th at pp. 535, 538.)

The Attorney General relied on *People v. Gomez* (2011) 192 Cal.App.4th 609 in arguing otherwise. However, *Elizalde*, filed after the Attorney General's brief, disapproved *Gomez* on this point. (*Elizalde*, *supra*, 61 Cal.4th at p. 538, fn. 9.)

### c. Conclusion

In sum, since the gang affiliation question is reasonably likely to elicit an incriminating response from a defendant who is in custody, it constitutes a custodial interrogation under *Miranda*. And, the question does not fall within the routing booking question exception to *Miranda*. (*Elizalde*, *supra*, 61 Cal.4th at pp. 535, 538.)

---

[24] *Elizalde* observed that it is still "permissible to *ask* arrestees questions about gang affiliation during the booking process" but the *answers* to the unadmonished gang questions are inadmissible. (*Elizalde*, *supra*, 61 Cal.4th at p. 541.)

V.	The *Miranda* and *Crawford* Errors, Together, Were Prejudicial Under *Chapman v. California* (1967) 386 U.S. 18

The *Miranda* and *Crawford* errors identified above are reviewed under the "beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18. (*Elizalde*, *supra*, 61 Cal.4th at p. 542 [*Miranda*]; *People v. Capistrano* (2014) 59 Cal.4th 830, 873 [Confrontation Clause]; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 [Confrontation Clause].)  "Under this test, the appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621, italics in original, quoting *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

The Attorney General argues that defendants "cannot show beyond a reasonable doubt that the result of their trial would have been different had the court excluded certain gang testimony under *Crawford*."  This contention inverts the *Chapman* standard, which places the risk of doubt on the government, not the defendant.  (*O'Neal v. McAninch* (1995) 513 U.S. 432, 439; see also *Chapman*, *supra*, 386 U.S. at p. 24 [constitutional error "casts on someone other than the person prejudiced by it a burden to show that it was harmless"]; *Elizalde*, *supra*, 61 Cal.4th at p. 542 [*Chapman* requires the People prove harmlessness].)  The *Chapman* standard is "reversal unless harmlessness is shown beyond a reasonable doubt" – not "affirmance unless prejudice is shown beyond a reasonable doubt."

Under the proper standard, we cannot conclude the errors were harmless.  The trial court itself correctly described the jail classification interview admissions as "very important."  Likewise, the evidence from police reports that defendants' wore gang colors and associated with other gang members in gang territory was an important basis for Officer Flowers's opinion that defendants were gang members.

23.

Without the erroneously admitted evidence, essentially all a jury would be left with is the defendants' gang tattoos. But, in order to satisfy the elements of section 186.22, subdivision (a), it must be shown the defendant's participation in the gang was "more than nominal or passive" (*Albillar, supra*, 51 Cal.4th at pp. 55, 58) "at or reasonably near the time of the crime." (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509.)[25] And to prove the enhancement, the prosecution must show defendants had the "specific intent to promote, further or assist in any criminal conduct *by gang members*."[26] (§ 186.22, subd. (b)(1), italics added.) The tattoos do not establish these requirements.

Conversely, the erroneously admitted evidence was otherwise quite compelling. The testimonial hearsay and un-*Mirandized* statements showed defendants (1) had personally and repeatedly admitted gang membership; (2) had repeatedly wore gang colors in gang territory in the past, and (3) had been repeatedly found with other gang members in gang territory. We cannot conclude beyond a reasonable doubt that "the guilty verdict actually rendered in this trial was surely unattributable" (*Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279, italics removed) to this erroneously admitted evidence.

## DISPOSITION

Defendants' convictions on count 5 are reversed. The true findings on the section 186.22, subdivision (b)(1) enhancements to counts 1 and 2 are reversed. The matter is

---

[25] Moreover, the prosecution must also show defendants had " 'knowledge that its members engage in or have engaged in a pattern of criminal activity.' " (*People v. Robles* (2000) 23 Cal.4th 1106, 1115.) Merely showing that a defendant is a member of the gang does not establish that they possessed this knowledge. (*Ibid*.)

[26] The only potential "criminal conduct" identified by the admissible evidence to support the enhancement would be the Denny's shooting itself. And in order for that conduct to be the proper object of a defendant's intent under section 186.22, subdivision (b)(1), it must have been committed by "gang members." (§ 186.22, subd. (b)(1).)

remanded to the superior court for resentencing. The People may retry defendants on count 5 and the section 186.22, subdivision (b)(1) enhancements to counts 1 and 2.

In all other respects, the judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
DETJEN, J.